Esteban LOPEZ, Plaintiff-Appellant,

v.

A/S D/S SVENDBORG and D/S of 1912 A/S, Defendants-Appellees.

No. 899, Docket 78-7046.

United States Court of Appeals, Second Circuit.

Argued May 25, 1978.

Decided July 24, 1978.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiff-appellant.

James M. Hazen, New York City (William P. Kain, Jr., Haight, Gardner, Poor & Havens, New York City), for defendants-appellees.

Before OAKES, Circuit Judge, and MEHRTENS * and BLUMENFELD,** District Judges.

BLUMENFELD, District Judge:

This is another case which calls for the application of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950. The plaintiff is a longshoreman who was accidentally injured while at work discharging cargo in the bottom of a hold on the M/S TREIN MAERSK, a vessel owned by the defendants A/S D/S Svendborg and D/S of 1912 A/S. He brought an action in negligence against the shipowner

---

* Senior United States District Judge for the Southern District of Florida, sitting by designation.

** Senior United States District Judge for the District of Connecticut, sitting by designation.

which was tried for two days before Judge Richard Owen and a jury. After the plaintiff rested, the trial judge granted the defendants' "motion to dismiss" for failure to prove a prima facie case of liability against the defendants. The jury was discharged without reaching a verdict. No findings were made as called for by Rule 41(b), Fed.R.Civ.P. The parties have treated this procedural posture of the case as if the court had granted a defendant's motion for a directed verdict under Rule 50(a). Since this was a trial to a jury, we are of the view that it is appropriate to consider the case on that basis.

At issue on this appeal is whether there was evidence of negligence by the defendant shipowner "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions . . . ." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969). *See also Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). In making that assessment we "must view the evidence and all inferences most favorably to the party against whom the motion is made," *O'Connor v. Pennsylvania R.R. Co.*, 308 F.2d 911, 914 (2d Cir. 1962). "The nonmoving party is given the benefit of all reasonable inferences from the evidence, and evidence unfavorable to it may be considered only if that evidence stands uncontradicted and unimpeached." *Bigelow v. Agway, Inc.*, 506 F.2d 551, 554 (2d Cir. 1974).

## I.

There was evidence from which the jury could have found the following facts: the plaintiff, a longshoreman employed by Universal Terminal and Stevedoring Co. as a hold-man, was discharging cargo from the square of the lower hold of Hatch No. 4 of the defendants' vessel on February 28, 1973, when he sustained an accidental injury to his back.

Lopez and the longshore gang of which he was a member had boarded the ship at 8:00 a. m. and were directed to begin at No. 4 hold, from which the hatch cover had already been removed. Loose cartons on top of the stow, held in place by the coaming, were quickly removed. The cargo below those cartons had been palletized. Even though the cargo may have been properly stowed before making a long voyage to New York from the Orient, it had shifted, apparently because of heavy seas. Not only had it shifted, but the cargo was in a considerably damaged condition. Packages had been damaged and kegs of bolts had broken open. Loose bolts were heavily scattered throughout the remainder of the cargo. Some bolts had sifted down as far as the floor of the hold through spaces created when the cargo shifted. The loose bolts scattered about made the hold a dangerous place for the longshoremen engaged in removing the cargo.

The condition of the stow in hold No. 4 was called to the attention of an officer of the ship and the stevedore's foreman by the hatch boss. Both looked down into the hold and observed it. The hatch boss asked, "What are you going to do with this mess?" In the presence of the ship's officer, he was told, "Keep working, the cargo got to come out of the ship, tell your men to be careful; keep working." Later that morning, after most of the cargo in the square of hold No. 4 had been removed, the plaintiff and a coworker were lifting a case from the floor of the square to a pallet from which it had fallen, when the plaintiff stepped on a loose bolt which caused him to slip and subject the muscles of his back to a sudden and unexpected strain, resulting in the injuries for which he sued.

## II.

The reasons Judge Owen gave for his decision to grant the defendants' motion to dismiss the complaint may be extracted from the statements he made during colloquy with counsel. More than one reason was given.

(1) First he considered the conduct of the plaintiff. He focused his attention upon the duty of the plaintiff with respect to the risk of injury.

"It seems to me absolutely clear on this record, without argument, that there is no jury question here. Longshoremen, since time immemorial have had to work under circumstances where there is litter, there is debris, there are turnbuckles, there are bales of wire, there are pieces of dunnage broken and unbroken, lying about areas in which they are working. And they are expected to cope with this kind of thing lying around the areas in which they are working." Tr. 226.

(2) Second, he considered the conduct of the defendants. Proof of the risk of injury to the plaintiff and of how it had been created did not pose any problem. That was evident from his application of what he conceived to be the law to the facts. Quoting from *Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861, 862 (2d Cir. 1977), he said,

"if you go with this case on the Ruffino test, . . . the law there is, 'Before liability can attach for [an] independently created danger,' which is here arguably heavy seas, 'the owner must have knowledge of its existence and [the] opportunity to alleviate it.' There is no question on this record the jury can find the owner knew of its existence." Tr. 227.

He continued:

"I just don't see how there was an opportunity here on [sic] the owner of the vessel to alleviate this condition, even assuming that you find it to be an independently created danger. . . .

". . . It is certainly reasonable for the vessel to assume that under these circumstances, experienced longshoremen would be able to avoid stepping on a bolt and taking a spill." Tr. 227–28.

By this juxtaposition of comments on the duty of the shipowner and the duty upon the plaintiff it appears that the Judge may have been adopting the harsh rule that contributory negligence is a complete bar to recovery. In admiralty contributory negligence may reduce, but does not bar, recovery for personal injuries. Under the admiralty rule the plaintiff's recovery is reduced in proportion to his own fault. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 98 L.Ed. 143 (1953). By its adoption of the 1972 Amendments to LHWCA, Congress intended that comparative negligence would apply to longshoremen's actions, and that assumption of risk would not. H.R.Rep.No.92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4705.[1] The ruling of the court was in error insofar as it was based on a conclusion that the plaintiff was barred from recovery because he was guilty of contributory negligence or had assumed the risk of his injuries. Whether, and to what extent, any contributory negligence of the plaintiff should reduce his damages must be left to the jury for its determination.

Having considered whether the plaintiff is entitled to be compensated, we turn next to the question of whether, in view of the fact that the shipowner knew of the dangerous conditions in the hold which existed when it was turned over to the stevedore, the shipowner ought to pay. There was evidence from which the jury could conclude that the defendant was negligent.

## III.

In defining the parameters of the case before us we heed the opening phrase of Judge Friendly's dissenting opinion in *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 at 687 (2d Cir. 1978):

"Courts must be exceedingly careful in defining the contours of the longshoreman's action for negligence against the ship, which was preserved by § 905(b) of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act . . . ."

1. ". . . [T]he Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable."

The purposes of Congress in enacting the 1972 Amendments to LHWCA have been so perceptively enlarged upon in other cases[2] that additional broad analysis here would be redundant.

■ Two principles are settled. In eliminating the absolute liability of a shipowner for unseaworthiness, the 1972 Amendments to LHWCA, 33 U.S.C. §§ 901–950, Congress intended that a vessel would be liable only for its own failure to use reasonable care, *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837, 840 (2d Cir. 1977), which would be determined in accordance with land-based principles of negligence, *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 507 (2d Cir. 1976). *See Ruffino v. Scindia Steam Navigation Co., supra*, 559 F.2d at 862.

■ As the trial judge correctly decided, there was evidence that the defendant knew of the risk of injury from the loose bolts to anyone working in hold No. 4. He was, nevertheless, persuaded to rule that no jury could properly find that the defendant was negligent. His recorded remarks disclose that he relied expressly upon a dictum in *Ruffino v. Scindia Steam Navigation Co., supra*, 559 F.2d at 862: "Before liability can attach for [an] independently created danger, the owner must have knowledge of its existence and [the] opportunity to alleviate it."[3] A fuller reading of *Ruffino* indicates that the "opportunity to alleviate" phrase is merely a timeliness gloss on the requirement of notice of the dangerous condition, meaning only that the defendant must have notice of it in sufficient time to take action to remedy it. In other words, "The mere existence of a defect or danger is not enough to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably con-

clude that due care would have discovered it." W. Prosser, *Law of Torts* § 61 at 393 (4th ed. 1971). The cases cited in *Ruffino* do not purport to give any content to "opportunity to alleviate" other than knowledge of the risk in time enough to take protective measures against the risk of injury.

We follow *Napoli v. Hellenic Lines, Ltd., supra*, which held that where there was sufficient evidence of knowledge by the shipowner of "obvious dangers which it should reasonably anticipate that the longshoremen would be unable to avoid," the case should have gone to the jury under § 343A of the Restatement (Second) of Torts. 536 F.2d at 509. In pertinent part, § 343A(1) states:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts § 343A(1) (1965).

This deviation from the general rule that reasonable care requires nothing more than a warning of the danger is a recognition that there are cases

"where the occupier, as a reasonable man, should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required. . . . In all such cases the jury may be permitted to find that obviousness, warning or even knowledge is not enough." W. Prosser, *supra*, § 61 at 394–95, *quoted with approval in Anuszewski*

2. *E. g., Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977); *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837 (2d Cir. 1977).

3. Immediately after quoting from *Ruffino* he continued:

"There is no question on this record the jury can find the owner knew of its existence.
"But where I come up against a wall is the opportunity to alleviate it. I don't see what

the shipowner could have been expected to do here in terms of curing this, because until you get down to the bottom of the cargo, you don't know whether you are going to find some bolts lying there, and first you've got to get the cargo out, and then sweep it up.
"I just don't see how there was an opportunity here on [sic] the owner of the vessel to alleviate this condition . . . ." Tr. 227.

**324**

*v. Dynamic Mariners Corp. Panama,* 391 F.Supp. 1143, 1147 (D.Md.1975), *aff'd,* 540 F.2d 757 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

Here, as in *Lubrano v. Royal Netherlands Steamship Co.,* 572 F.2d 364 (2d that a vessel would be liable only for its own failurd Cir. 1978), there was evidence of direct knowledge of the unsafe condition before the injury occurred and that the ship's officer knew that nothing was going to be done to alleviate it. What was said there is squarely applicable, at 367: "But if there is again evidence that a ship's officer, after being notified of the open and obvious danger of insufficient dunnage for a slippery cargo, had the men keep working *or joined in the stevedore's decision to do so,* then there would be a jury question." (Emphasis added) In this case the evidence "was enough to allow a jury to conclude that the ship's officer approved and joined in the direction that the men keep working . . . ." *Id.,* at 367. The plaintiff was not instructed as to what he should do about the "mess" but was apparently allowed to use his own judgment. The circumstance that the risk of harm was not recognized until the removal of the cargo was in progress is no basis for failure to take precautionary methods against it after the dangerous condition became known. Indeed, the Restatement (Second) of Torts § 413 requires the employer of an independent contractor to use reasonable care to provide for precautions where the work to be done *should be recognized* "as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken . . . ."[4] Comment d. states:

"Although the employer at the time he lets the contract has no reason to anticipate that conditions will arise which re-

quire special precautions to be taken, if in fact such conditions do arise and he knows or should know of them, he is then required to act in the manner required by the rule stated in this Section."

The fact that differences frequently arise as to whose duty it is to take precautionary measures in cargo removal operations indicates the applicability of § 413, for as Comment b. explains:

"This Section is concerned with special risks, peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions. The situation is one in which a risk is created which is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity, arising out of the particular situation created, and calling for special precautions."

Under the foregoing principles the jury could have found that the defendant was negligent toward the plaintiff.

### IV.

The fact that the stevedore shared in the decision to continue working did not exonerate the shipowner, and there is no reason, as a matter of fundamental tort law, why it should not be held liable in damages for its own negligence. It is well established tort law that "an actor whose negligence has set a dangerous force in motion is not saved from liability for harm it has caused to innocent persons solely because another has negligently failed to take action that would have avoided this." *Petition of Kinsman Transit Co.,* 338 F.2d 708, 719 (2d Cir. 1964), *cert. denied sub nom. Continental Grain Co. v. City of Buffalo,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965). Thus, even if the stevedore was

---

**4.** Restatement (Second) of Torts, § 413 reads: "One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

  (a) fails to provide in the contract that the contractor shall take such precautions, or

  (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

negligent in failing to eliminate the dangerous condition, that would not be a defense for the shipowner. Moreover, in *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo,* 528 F.2d 669, 674 (9th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), it was expressly held "that a longshoreman who has been injured by the concurring negligence of his employer stevedore and the vessel owner can recover the total of his damages from the vessel owner." We have also rejected a contention by a shipowner that an injured longshoreman could not recover damages against it unless he proved that the shipowner was solely responsible for his injury, stating:

"First, the draftsmen of section 5(b), 33 U.S.C. § 905(b), could easily have inserted the word 'sole' so that the clause would have read 'caused by the "sole" negligence of the vessel.' Nothing has been called to our attention to indicate such intention. Second, Congress would hardly have given the ship so little incentive to avoid being negligent toward its longshoremen invitees. Third, the scheme of the Act is to provide workmen's compensation for a longshoreman from his own employer, but with a right to sue the ship for negligence. We cannot agree that some negligence by the employer is enough to cut off the injured longshoreman's protected right to sue the ship for its own negligence. Of course, if the negligence was *solely* that of the stevedore, the ship would have been found neither negligent nor liable." *Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 763 (2d Cir. 1975) (footnote omitted), *cert. denied sub nom. A/S Arcadia v. Gulf Insurance Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976)..

After our decision in *Landon,* the court in *Dodge, supra,* 528 F.2d at 672, in taking the view we expressed, quoted with approval from *Santino v. Liberian Distance Transports, Inc.,* 405 F.Supp. 34, 35 (W.D.Wash. 1975):

" 'On its face it seems inequitable for a shipowner to be liable to an injured longshoreman for all of the latter's damages if the negligence of the shipowner was not the sole proximate cause of the injuries but rather concurred with the negligence of the stevedore employer. Particularly would this be true if the fault of the stevedore employer were much greater than that of the shipowner. Nevertheless, since the Longshoremen's and Harbor Workers' Act is a creature of Congress, it would in this Court's opinion be better for Congress to effect the elimination of any inequity than to have the various District Courts seek to remove that inequity by means which would unavoidably vary from district to district.

" 'Permitting a shipowner to plead the negligence of the stevedore as an affirmative defense would not eliminate inequity. *It would simply shift the inequity from shipowner to injured longshoreman. He would be restricted in his recovery as against the shipowner without acquiring any offsetting rights under the Act as against his stevedore employer.'* (emphasis added)."

And, more recently, the Fifth Circuit adhered to the rationale of *Dodge* and *Landon* in upholding a judgment for a longshoreman against a vessel owner for negligence in a terse and vigorous opinion by Judge Rubin, who considered cases from other circuits with contrary holdings. *Samuel v. Empresa Lineas Maritimas Argentinas,* 573 F.2d 884 (5th Cir. 1978). The rule that the shipowner cannot use the negligence of the stevedore as a defense to a negligence action against it brought by the injured longshoreman, is strengthened by its corollary that the shipowner cannot assert the stevedore's negligence to defeat the stevedore's right to reimbursement of compensation payments out of any damages the longshoreman may recover. In *Pope & Talbot, Inc. v. Hawn, supra,* the Court held that even though the stevedore was concurrently negligent, it could still recover its compensation lien in full, noting, 346 U.S. at 412, 74 S.Ct. at 206, that "reduction of [the shipowner's] liability at the expense of [the stevedore] would be the substantial equivalent of contribution which we declined to

require in the *Halcyon* case."[5] We have recently held that *Pope & Talbot* is still good law. *Landon, supra,* 521 F.2d at 760.

## V.

Despite the existence of evidence from which the jury could have found that the condition which constituted the risk of injury to the plaintiff was attributable to the ship alone, the defendant contends that it should not be held liable for his injuries. It argues that it was reasonable as a matter of law for the shipowner to do nothing to remedy the condition because it could rely upon the stevedore to take necessary precautionary measures. A vigorous dissent in *Lubrano, supra,* contended for that view on the ground that the stevedore was an independent contractor to whom control over the premises had been relinquished. Support for that view is also found in Judge Friendly's dissenting opinion in *Canizzo, supra,* at 688 of 579 F.2d, where he says:

**5.** *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952).

**6.** A different view of Congressional awareness of what it was doing was expressed in *Lubrano:* "The ultimate decision reached by Congress was not made lightly. Instead, the result reflects a delicate balancing by Congress of the interests of the various parties involved. The longshoremen received increased benefits, the shipowners are liable only if negligent, and the stevedore did not face the *Ryan [Stevedoring Co., Inc. v. Pan Atlantic S. S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)] secondary suit." *Lubrano v. Royal Netherlands,* 572 F.2d 364 at 370 (2d Cir. 1978) (Moore, J., dissenting).

**7.** Judge Smith commented, at 686 n. 3:
"*Cox v. Flota Mercante Grancolombiana, S.A.* was decided May 10, 1978, [577 F.2d 798] slip op. 2989ff, while this case was sub judice. *Cox* seems to us in conflict with at least *Lubrano v. Royal Netherlands S.S. Co.,* 572 F.2d 364 (2d Cir. 1978), among the decisions in this circuit.
"While each case must be determined on its own facts, the result in *Cox* cannot reasonably be reconciled with our result here by the differences in the factual situations, for the proof of ship's negligence in *Cox* was at least comparable to that here. With all respect, however, we must disagree with the result in *Cox.* It appears to us to do what

"In dealing with § 905(b), courts would do better to consider the policies that actuated Congress in adopting the 1972 Amendments. In my view Congress did not mean to subject the ship to liability for every dangerous condition known or knowable to it when it had a right to assume that this would be remedied by the employer, as § 941(a) requires." [6]

The recent decision in *Cox v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 798, (2d Cir. 1978), reversed a jury verdict in favor of Cox, a longshoreman, against the ship on the ground that it was the stevedore's duty alone as an independent contractor to remedy unsafe conditions. The *Cox* decision was handed down "in the face of known disagreement by a majority of [the] panel" in *Canizzo, supra,* which *upheld* a jury verdict for a longshoreman against a ship and included a comment on *Cox's* contrary view.[7]

This case also will fall within what seems to be rapidly becoming an overly complex

the Congress was unwilling to do, abolish the shipowner's liability to the injured longshoreman in negligence as well as in unseaworthiness. As Judge Friendly points out, liability of the ship for such negligence as a greasy deck attributable to the ship's company was specifically contemplated and thought to be preserved by the legislation.
"Litigation in this troubled field would be tidier if the Congress had eliminated altogether the ship's possible liability to longshoremen. There are, however, other considerations.
"Benefits under the Longshoremen's and Harbor Workers' Act have been considerably increased. We cannot overlook the fact, however, that as is usual under workmen's compensation schemes, they do not fully compensate for the loss suffered. If the ship, not a party to the employment contract, is absolved from liability for its own negligence, this uncompensated loss, which may be very great, is shifted from the negligent ship to the often innocent employee. The terms of the statute and the legislative history indicate to us that while Congress was willing to shift the burden of injury without fault to an improved compensation system for shore workers (who arguably never should have been classified with seamen anyway) it was not willing so to shift the burden of injury through the fault of the ship. This policy judgment we would leave to the Congress."

and unpredictable body of law. Because of the different views as to whether an employer's failure to remedy a dangerous condition is a defense to a suit by the longshoreman against a ship for its own negligence, we feel that it may not be amiss to explain why we do not agree that the failure of the stevedore to remove or provide protection against the conditions created by the shipowner relieves the latter of liability for injuries to a longshoreman caused by those conditions.

To avoid the risk of being misunderstood, we do not say that a shipowner should be held *vicariously* liable for the tortious acts of an independent contractor, or his servants. But the shield against vicarious liability for the negligence of an independent contractor does not also shield the shipowner from liability for its own negligence. Although § 905(b) may be construed to "demonstrate that . . . the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore," *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 860 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Ramirez v. Toko Kaiun K. K.*, 385 F.Supp. 644, 653 (N.D.Cal.1974), or that "the primary duty to provide a safe place to work is on the stevedore," *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759, 768 (E.D.Pa.1974), neither "major responsibility" nor "primary duty" may be read as "sole responsibility." *See Landon, supra*, 521 F.2d at 762–63.

In rejecting the argument of a shipowner that it should not be held liable unless its negligence was the sole cause of the damages, we noted in *Landon, id.* at 763: "Congress would hardly have given the ship so little incentive to avoid being negligent toward its longshoremen invitees." The basis for an assumption that prevention can be maximized by shifting the liability to one already liable, and only for a lesser amount, is doubtful.[8]

When Congress relieved the shipowner of the no-fault concept of seaworthiness, it preserved the liability for negligence, explaining, H.R.Rep.No.92–1441, *supra*, at 4703, "This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits." And, the House Report also noted, *id.* at 4704, "nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition."

Furthermore, Congress also expressly refused to treat vessels as joint employers of longshoremen:

"This would result in restricting the vessel's liability in all cases to compensation and other benefits payable under the Act. The Committee believes that where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured." *Id.* at 4702.

It could not be clearer that Congress intended shipowners to be liable for their own negligence.

Defendant contends that it cannot be held liable for negligence toward plaintiff because it was entitled to rely on the stevedore's primary duty to alleviate any condi-

---

**8.** For a detailed analysis, and a comprehensive collection of cases and authoritative treatises and articles dealing with this question, *see* Comment, *Risk Administration in the Marketplace: A Reappraisal of the Independent Contractor Rule*, 40 U.Chi.L.Rev. 661 (1973). The article states:

"Nothing in economic theory or practical experience leads to the conclusion that either employers as a class or independent contractors as a class are in all cases better able to distribute the costs of risk." *Id.* at 672.

Removing the incentive upon the shipowner to prevent injuries does not increase the incentive of the employer who is liable whether negligent or not. While both employ subordinates to work for them, it seems obvious that a shipowner, as an entrepreneur is in a better position to distribute the loss than a stevedore, whose business is to furnish only a relatively small proportion of the total amount of services which the shipowner provides to shippers.

tion dangerous to its employees. One difficulty with this argument is that the right to rely is based on an agreement between the shipowner and the stevedore. Rules regulating the conduct of persons toward others must be distinguished from agreements governing organization of the work.

■ The particular ingredient of the independent contractor relationship from which the defendant seeks to forge a shield against liability for its own negligence is said to be the independent contractor's control over the work and the place where the work is done. It is self-evident that if the shipowner relinquishes control of an unsafe place to work to the sole control of the stevedore, that relinquishment comes about because of an agreement it makes with the stevedore.[9] The parties may be careful in drawing their contract to provide an appearance of independence or control of the area where the work is to be done. But to enable a shipowner to escape liability by entering an agreement with the stevedore would contravene Congress' intention.

The 1972 amendments did not modify § 905(a) by which Congress had explicitly made the employers absolutely liable for compensation "exclusive and in place of all other liability . . . to the employee." *See Louviere v. Shell Oil Co.*, 509 F.2d 278 (5th Cir. 1975), *cert. denied sub nom. American Marine Corp. v. Louviere*, 423 U.S. 1078, 96 S.Ct. 867, 47 L.Ed.2d 90 (1976). Section 905(b) provides from the other side that in the case of injury to a covered employee, "the employer shall not be liable to the

vessel for such damages directly or indirectly and *any agreements or warranties to the contrary shall be void.*" (Emphasis added)

The intent of Congress in outlawing such agreements is spelled out in H.R.Rep.No. 92–1441, *supra*, at 4704–05:

"Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act [33 U.S.C. § 905] by requiring indemnification from a covered employer for employee injuries.

"Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the Committee's intention to *prohibit such recovery under any theory including, without limitation, theories based on contract or tort.*[10]

"Under the proposed amendments the vessel may not *by contractual agreement or otherwise* require the employer to indemnify it, in whole or in part, for such damages." (Emphasis added)

In *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714 at 721 (2d Cir. 1978), Judge Friendly observed that the legislative history "does indicate that § 905 was meant to prevent *Ryan* indemnity actions by vessels . . . ." And he stated, *id.:* "The shipowners got a *quid pro quo* for the loss of their indemnity rights." The *quid pro quo* was the mitigation of the harsh no-fault doctrine of seaworthiness. *See S. S. Seatrain Louisiana*

---

**9.** In this case neither the scope of the work to be done by the stevedore, nor the extent of its control over the place where it was to be done, were established. There is nothing in the record to establish that the defendant's right as operating owner to control the ship, including the No. 4 hold, at the time the plaintiff was injured was in any way curtailed. *Cf. Hawn v. Pope & Talbot, Inc.*, 198 F.2d 800, 803 (3d Cir. 1952), *aff'd*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). Nor is there anything in the record to establish that the scope of the work contracted for with the stevedore included the duty to pick up the bolts and replace them in the broken kegs and recooper the kegs. Whose duty it was to clean up "the mess" is disputed. Although the plaintiff reported the condition he

did not refuse to continue to work at unloading the cargo. In a similar situation a Court of Appeals held that a judge's finding that the plaintiff was 75 percent contributorily negligent had to be modified because the evidence would not support a conclusion that the plaintiff was more than 50 percent at fault. *Mazzanti v. Lykes Bros. Steamship Co.*, 524 F.2d 961 (5th Cir. 1975).

**10.** For a thorough and perceptive analysis of the differences between tort-based and contract-based indemnity such as we have become accustomed to expect from Judge Friendly, see *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714 (2d Cir. 1978).

*v. California Stevedore & Ballast Co.*, 424 F.Supp. 180, 182–83 (N.D.Cal.1976). Indeed, the House Report states, H.R.Rep. No.92–1441, *supra*, at 4704: "The Committee also believes that the doctrine of the *Ryan* case . . . is no longer appropriate . . . ."

To permit a shipowner to negotiate with the stevedore by "contractual agreement or otherwise" for cargo removal operations so as to relieve it of liability to the longshoreman for damages caused by its own negligence, on the ground that the shipowner had a right to rely on the stevedore to remove the cause, would be to restore the kind of right to indemnity which § 905(b) eliminates. It seems to us that on any fair assessment of the legislative scheme in § 905(b) the implication of a right of exoneration in the shipowner from an employer based on the "independent contractor" relationship would be alien to Congress' intention. The rule regarding indemnity agreements, while not directly applicable to the question of whether the shipowner can be found negligent, is a crucial part of the legislative scheme. To maintain the integrity of that scheme, we should not adopt a rule as to negligence that is so inconsistent with the indemnity prohibition as to undermine a principle which Congress has established as fundamental. As stated in an analogous context in *Laird v. Nelms*, 406 U.S. 797, 802, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972): "To permit [defendant] to proceed on [an independent contractor] theory here would be to judicially admit at the back door that which has been legislatively turned away at the front door. We do not believe the Act permits such a result." There is no warrant for a contention that a right of indemnity arising out of the relationship between an employer and its independent contractor is intrinsically immutable. Congress has excised that incident of the relationship "as a matter of public policy" in cases covered by § 905(b).

As an abstract matter an argument can be made that after turning over a job of work to be done aboard its ship to a stevedore a shipowner ought not to be liable for damages suffered by a longshoreman for pre-existing dangerous conditions it has created, or negligently failed to correct. The argument advanced in some of the cases, as noted in the dissenting opinion in *Canizzo, supra*, is that when dangerous working conditions arise the shipowner may justifiably rely on the independent contractors to "take care of the problem as they were bound to do." *Id.*, at 690.[11] Even if it might be said that there can be such a duty to the shipowner, despite an express redaction in § 905(b) of any remedy for its breach, that would not relieve the ship of its own duty to exercise reasonable care. But a provision in a law which has been enacted by Congress must be distinguished from one which might have been but was not. Our concern is not to assess the fairness of a legislative scheme. Even if we were permitted to do so, we could not say that there is no rational, fair basis for holding a shipowner liable for its own negligence, instead of singling out the stevedore who did not create the risk, to be solely responsible.

Whether due care has been exercised in any negligence case depends on what care has been taken—not on who has been hired to take it. Since the work was permitted to go forward under conditions of danger known both to the ship and to the stevedore, the rule of § 343A(1) should have been applied by the jury to the facts of the case as they might find them to be in order to determine whether the defendant is liable for damages. "Should the jury be persuaded . . . and find that the shipowner was negligent in not correcting the open and obvious danger but that the plaintiff was contributorily negligent, it would apply the doctrine of comparative negligence to reduce the shipowner's liability

---

11. Statements in some of the cases to the effect that "[t]he shipowner had no duty to supervise the minute details of work totally entrusted to the competence of the stevedore," as in *Munoz, supra*, 553 F.2d at 840, and in *Ruffino, supra*,

559 F.2d at 863, when read in context, are relevant only to whether a shipowner had notice of a claimed defect. They do not address the problem in this case.

proportionately." *Napoli, supra*, 536 F.2d at 509.

 The ruling of the court below took from the jury both the issue of the defendant's responsibility for the unsafe condition of the place where the plaintiff was required to work, and the issue of to what degree, if any, his own conduct in the face of the known danger should reduce his recovery. As we have indicated above, both issues should have been left to the jury. Accordingly, we reverse and remand for further proceedings not inconsistent herewith.